Peck, J.,
delivered tbe opinion of tbe court :
James Lee, a citizen of Milwaukee, in tbe State of Wisconsin, by bis petition represents that, in tbe year 1803, be submitted to tbe War Department a specimen of bis improved breech-loading rifle or carbine for inspection and trial, with a view to obtaining a contract for supplying said arm for tbe use of tbe armies of tbe United States; that on or about tbe 19th day of April, 1864, be submitted a proposition in writing to tbe Secre-retary of War to furnish 1,000 of such carbines to the United States for tbe sum of $18 for each carbine; that on tbe 7th of May following be was informed, by a communication from tbe Bureau of Ordnance, that a contract for that number of bis carbines would be awarded bim, provided certain modifications and alterations specified should be made in some of tbe minor devices of said arm; that the alterations required were accordingly made, at great expense to him; that on tbe 13th day of April, A. D. 1865, be received from tbe Chief of Ordnance for tbe United States tbe following communication:
“ Okdnance Office, War Department,
“ Washington, April 13, 1865.
“ Sir : Yon will please deliver to tbe inspector of small arms tbe 1,000 breech-loading carbines, calibre 0.44, and appendages, tbe order to furnish which was given to you on tbe 7th day of May, 1864, for which $18 will be paid for each carbine, including appendages, that is approved by tbe inspector. Please forward *159 to this office, as soon as possible, two (2) carbines, to be used as standards in the inspection and reception of the above.
“ These 1,000 carbines will be packed in suitable boxes, for which a fair price, to be fixed by the inspector, will be paid.
■ “Respectfully, your obedient servant,
“A. B. DYER,
“Brigadier General, Chief of Ordnance.
“Mr. James Lee,
“Milwaukee, Wisconsin.”
That, in pursuance of this authority, he proceeded in good faith to perforin on his part; and thereupon he established a machine shop, and supplied the same with complicated machinery necessary to the manufacture of the said carbines; and that he also purchased all the materials necessary to enable Mm to fulfil his engagements; that he procured, at Ilion, in the State of New York, the barrels with wMch to make said carbines, which were there inspected by an officer of the United States army assigned to that duty, who approved the same, and marked them as being proper and suitable for use in said carbines; which barrels, so inspected and marked, were transported to Milwaukee, and used in the construction of said carbines; that he proceeded diligently to manufacture and to have ready the said carbines as soon as practicable, in the fulfilment of said contract,, and forwarded two of the said carbines, as models, to the Ordnance Office at WasMngton; that afterwards, in the month of September, 1865, he was informed and notified that the said 1,000 carbines would not be accepted or received by the United States, because the calibre thereof was too small; that, before he received this notice, all of the said carbines and appendages were finished, or in process of completion; that as soon as he became convinced that the United States would not receive the said carbines, he ceased to work upon them, and finished no more of them; that the carbines he had made and was making, up to the time of the suspension of his work, were identical in calibre, and in every other respect, with the specimen carbine which was submitted by him for inspection and trial as an inducement to the United States to enter into a contract with Mm, except as to the modifications and alterations required by the communication from' the Bureau of Ordnance, dated the 7th of May; that when he stopped work on said carbines about *160 500 of them, were finished in a good and workmanlike manner, and that the remainder could have been completed at an expense of about $4 each; that he has sold and disposed of about 100 of said carbines at $20 each, but that he has been unable to dispose of the remainder of them, and that they are now on his hands and unsalable; that he was always ready and willing to carry out his said agreement in good faith, and was doing so on his part, until stopped and discharged therefrom by the United States; that there is now due to him from the United States $12,000, for his costs and expenses incurred by him in and about the purchase of material, and the labor employed for the procurement by him of the said carbines and preparing them for delivery 5 that there is due to him the further sum of $3,000 as damages which he has suffered; making his demand the sum of $15,000.
These allegations of the petitioner, for the most part, are well sustained by the evidence in the record.
The controversy in this case springs from the fact, as is represented, that the carbines were manufactured with a barrel or calibre of instead of of an inch. An examination of the evidence does not show that the omission to make the guns of the calibre of was the fault of the claimant. It might with much propriety be urged that this contract was made upon the sample carbine submitted by the claimant for inspection when he solicited the contract, which carbine was of calibre 0.42. The word and numerals “ calibre 0.44,” in the letter of April 13,1865, copied at length in the statement of the petition, will not control the words of the contract or order about the guns of May 7,1864, which is referred to as the origin of this agreement. The letter of the 7th of May is as follows, and, although it suggests that there were defects in the sample carbine, which were to be, and which were, in fact, remedied, the calibre was not one of them:
“ ORDNANCE Oeeioe, May 7, 1864.
“ Sib : Your letter of April 19, to the Secretary of War, offering to furnish 1,000 of your breech-loading carbines at $18, has been referred to this office, with authority to enter into such contract with you.
u Should, you,, therefore, present to this department a carbine free *161 from the defects mentioned in Captain Bentords report, the contract will then he given you.
“The defect was, ‘the cartridge case ejector frequently failed to start the case; the projection next to the case (on the ejector) appears to be too short to take a firm hold on the rim of the case.’ The carbine must be presented this or next month.
“Respectfully, your obedient servant,
“GEO. D. RAMSAY,
“ Brigadier General, Chief of Ordncmce.
“James Lee, Esq.,
“ Washington. B. O.”
It will be observed that this letter was written before the claimant had commenced to manufacture the carbines, and when, if ever, the objection to the calibre ought to have been made, if it was indispensable that the calibre should be 0.44. The claimant could then have complied with the condition, or declined the contract altogether.
■This was not all: On the 20th of June, 1864, claimant made an application in reference to the carbines, but yet no objection to the calibre of his carbine appears.
But these are not all the difficulties in the way of believing that the calibre was the controlling subject of the contract. On the 5th of September, 1865, W. A. Thornton, colonel of ordnance and inspector of arms, especially assigned to inspect these carbines, writes to claimant saying that “one model carbine is received, and in answer I have to inform you that I can do nothing in the matter until you furnish two models, as per contract.” Although this model was not returned to the claimant until the 12th of October following, and then with'some objections, it does not appear that the calibre was a cause of complaint. Afterwards, and as late as January, 1866, when the two model guns were received by the inspector, they were approved by him, the calibre of those being also 0.42. These models were transmitted by the inspector to Washington. From Washington, on the 29th January, 1866, is heard for the first time any intimation that there was an objection to the carbines on account of their calibre. Colonel Treadwell, an ordnance officer, writes to Colonel Thornton, in New York: “The two Lee carbines, referred to in your letter of January 20, have been received. I find that they gauge only 0.42 cali- *162 bre, while my order of April 13,1865, calls for carbines of 0.44 calibre. Please see if the carbines will take the cartridge for Silencer carbine, calibre 0.44; if so, these may be returned for stamp as model carbines for the inspection.”
' On the 6th of February following, Colonel Thornton, in acknowledging the above letter of the 29th January, says: “I have now to report that the thought never entered my mind that his pattern carbines were below size in calibre, and I consequently did not verify them as to the size of the bore when I made-'their inspection.” If the thought had never entered the mind of the inspector that the calibre or bore of the carbines Avas below size, it was, of course, not suggested to the claimant by him; and it may well be inferred that the inspector was not instructed that it was necessary that the caliber should be different from the sample presented when the contract was sought for; or that a bore or calibre different from that of the barrels which had been inspected and approved, at Ilion, by the government inspector, would be required. It appears to us, and we think it would also appear to every candid person who will consider all the opportunities afforded to the United States to object to the calibre of the carbines, and the subsequent approval of them by different inspections, that it is now too late to raise this objection. It is to be hoped that the objection was not suggested because the supply of arms had become much greater than the need for them. When the carbines were needed, the calibre was not a matter of serious importance; when they were not needed, the calibre became the controlling element in the contract.
The next matter for consideration is the damageswhich should properly be allowed the claimant, by reason of the refusal of the United States to accept the carbines. There appears to have been an effort to compromise between the agents of the United States and’ the claimant. An officer of the ordnance department was sent to Milwaukee to ascertain Avhat progress had been made by claimant towards filling the order for the carbines ; who made a detailed report in the premises, shoAvingthat claimant had expended $14,350 15 about his contract. This officer suggests that "if the government compromises the matter, a sum should be paid that Avould enable him (claimant) to offer his arms at a low rate in the market, and thus facilitate a *163 sale.” A very reasonable anti sensible suggestion, and be advises a compromise upon those terms.
Upon this subject General A. B. Dyer, Chief of Ordnance, addressed a letter to the Secretary of War, from which we make extracts. The letter was dated February 18, 1867.
“There are, I think, but two ways for a fair settlement with Mr, Lee:
“ 1st. To require him to fulfil his contract by delivering the 1,000 carbines. This would cost the government $18,000, the contract price of the arms, exclusive of the cost of inspection and transportation; and the arms, on account of their calibre and kind, would be of no use now to the government for issue, and it would also entail a loss on the contractor of about $6,500.
“2d. To compromise, sharing the loss with Mr. Lee by paying to him $4,087 57 on account of expenses incurred under the contract. This would save the government not less than $6,000 and is the preferable mode, so far as relates to the government interest in point of economy.
“ I would recommend the second mode of settlement, if it be considered legitimate to enter into a compromise under the circumstances — the amount to be received by Mr. Lee as a full and complete satisfaction of ail claims against the government on account of said contract or order.”
This letter, while it indicates a proper plan of compromise, fully admits the obligations of the government towards the claimant, and shows that he has a good cause of action.
The Assistant Attorney General urges, on behalf of the United States, that this case has no other support than that of an alleged contract, of which the claimant does not show fulfilment. If the contract did not exist, then the claimant need not show fulfilment; but the contract was concluded, as the proposal and acceptance fully evidence, and so both parties understood and acted. The Assistant Secretary of War, O. A. Dana, directed as follows: “The Chief of Ordnance will order 1,000 of Lee’s breech-loading carbines for trial in the field;” which was followed by the letter of 7th May, 1864, already recited, and by several other letters from the ordnance department recognizing and referring to the contract as already existing. The barrels were inspected by and under the decision of the authorized officers of the United States, all which proofs and circumstances fully establish a contract. That the claimant attempted to fulfil *164 tbe contract in good faith is very apparent from the letter of General A. B. Dyer, Chief of Ordnance, of the 18th February, 1867, before quoted. That he did not fully complete the contract was the fault of the United States. The claimant was informed that his carbines would not be accepted, u as they would not be of use to the government for issue.”
The claimant was not bound, after having been informed that his carbines would not be accepted, to go on and complete them. After that notice he had a right to stop, and the United States cannot complain that he did so.
In this, as in many other cases we are called to examine, it is difficult, always, to concur in opinion as to the amount of damages proper to be awarded. Evidence which is convincing to one person does not always make a like impression upon the minds of others. We have examined the evidence with much care, and have come to the conclusion that, as the claimant still retains his machinery and a large amount of material for the construction of carbines, he should recover for his damages the sum of $6,175, and it is so ordered.